# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JARVIS L. POSTLEWAITE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 13 C 8756 |
| v. ) | |
| ) | |
| DR. SALEH OBAISI, DR. ANN DAVIS- ) | |
| HUNTLEY, and WEXFORD HEALTH ) | |
| SOURCES, INC., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

On September 26, 2014, Plaintiff Jarvis L. Postewaite, an inmate of the Illinois Department of Corrections ("IDOC"), filed a First Amended Complaint, by counsel, alleging that Defendants Dr. Saleh Obaisi, M.D. ("Dr. Obaisi"), Dr. Ann Davis-Huntley, M.D. ("Dr. Davis"), and Wexford Health Sources, Inc. ("Wexford") violated his Eighth Amendment rights. *See* 42 U.S.C. § 1983. In particular, Plaintiff alleges that Defendants were deliberately indifferent to his serious medical needs in relation to the treatment of his right ear condition while he was incarcerated at the Stateville Correctional Center ("Stateville").[1]

Before the Court is Defendants' motion for summary judgment brought pursuant to Federal Rule of Civil Procedure 56(a) and Northern District of Illinois Local Rule 56.1. For the following reasons, the Court grants Defendants' summary judgment motion and dismisses this lawsuit in its entirety.

---

[1] In his response brief, Plaintiff voluntarily dismisses Defendants Dr. Davis-Huntley and Wexford Health Source, Inc. from this lawsuit. (*See* R. 68, Resp. Brief, at 3 n.2.)

## BACKGROUND

**I.     Parties**

Since 2012, Plaintiff has been incarcerated and in the custody of the IDOC. (R. 58, Defs.' Rule 56.1 Stmt. Facts ¶ 1.) At the time of the events described in his First Amended Complaint, Plaintiff was housed at Stateville. (*Id*.) Wexford is a medical contractor for the IDOC and Stateville. (*Id*.; R. 69, Pl.'s Rule 56.1 Stmt. Add'l Facts ¶ 19.) Defendant Dr. Obaisi, an employee of Wexford, is licensed as a physician in Illinois and worked in this capacity at Stateville at the time he treated Plaintiff. (Defs.' Stmt. Facts ¶ 2; Pl.'s Stmt. Facts ¶ 20.) Dr. Davis is licensed as a physician in Illinois and worked in this capacity at Stateville at the time she treated Plaintiff. (Defs.' Stmt. Facts ¶ 3; Pl.'s Stmt. Facts ¶ 20.)

**II.    Medical Treatment at Stateville**

In early 2013, Plaintiff began experiencing right ear pain while incarcerated at Stateville. (Defs.' Stmt. Facts ¶ 7.) On January 8, 2013, a prison nurse, who is not a party to this lawsuit, treated Plaintiff by providing medication for Plaintiff's ear pain. (*Id*.) In addition, the nurse scheduled an appointment with a physician for the next day. (*Id*.) On January 9, 2013, Dr. Obaisi examined and treated Plaintiff. (*Id*. ¶ 8.) In particular, Dr. Obaisi diagnosed Plaintiff with ceruman (ear wax) impaction to the right ear, prescribed Debrox ear drops for ten days, and directed health care staff to flush (irrigate) Plaintiff's ear. (*Id*.; Pl.'s Stmt. Facts ¶ 1.) On January 19, 2013, Plaintiff went to the health care unit for an ear flush. (Defs.' Stmt. Facts ¶ 9.) According to Plaintiff, earwax and parts of cockroaches came out of his ear during the flush. (*Id*.; Pl.'s Stmt. Facts ¶ 2.) At that time, health care staff prescribed eardrops. (Defs' Stmt. Facts ¶ 9; Pl.'s Stmt. Facts ¶ 1.) At his deposition, Plaintiff testified that the eardrops contained

2

antibiotics, although the IDOC medical records did not indicate that the prescribed eardrops had antibiotic ingredients. (Defs.' Stmt. Facts ¶ 9; Pl.'s Stmt. Facts ¶ 1.)

Dr. Obaisi saw Plaintiff again in April 2013 regarding an injury to Plaintiff's small finger on his left hand that occurred while Plaintiff was playing basketball. (*Id.* ¶ 10.) Specifically, on April 16, 2013, Dr. Obaisi reviewed an x-ray of Plaintiff's left hand and also conducted an examination for a medical history report, including examining Plaintiff's right ear. (*Id.*) Dr. Obaisi noted that Plaintiff's right ear was within normal limits and that Plaintiff had no other problems at the time of the visit. (*Id.*) On April 23, 2013, Dr. Obaisi saw Plaintiff for the left hand/small finger injury. (*Id.*) During both April 2013 visits, Dr. Obaisi documented Plaintiff's other conditions. (*Id.* ¶ 11.)

Plaintiff returned to the health care unit on June 22, 2013 and June 29, 2013, due to the re-injury of his left hand/small finger. (*Id.* ¶ 12.) Dr. Davis saw Plaintiff on June 29, 2013, at which time she created an assessment for monitoring Plaintiff's psychiatric medications, applied a splint to his left finger, checked x-rays, and ordered a full set of labs to monitor his health. (*Id.*) Meanwhile, on July 23, 2013, a nurse saw Plaintiff for his right ear pain. (*Id.* ¶ 14; Pl.'s Stmt. Facts ¶ 14.) The nurse administered the protocol for earache/ear wax impaction prescribing Plaintiff Acetaminophen and Debrox ear drops. (Defs.' Stmt. Facts ¶ 14; Pl.'s Stmt. Facts ¶ 14.) Plaintiff maintains that the nurse did not prescribe any oral antibiotics at that time. (Pl.'s Stmt. Facts ¶ 14.)

Further, the health care staff scheduled medical appointments for Plaintiff on August 24, 2013, August 28, 2013, August 31, 2013, September 7, 2013, and September 9, 2013, but because Stateville was on lockdown on these days, Plaintiff could not leave his cell to go to his medical appointments. (Defs.' Stmt. Facts ¶ 15.) Dr. Davis then treated Plaintiff on September

3

19, 2013.  (*Id*. ¶ 16; Pl.'s Stmt. Facts ¶ 16.)  At that time, Dr. Davis did a full assessment of Plaintiff's right ear and found that the right ear canal had erythematous or otitis externa, namely, inflammation of the ear canal.  (Def.'s Stmt. Facts ¶ 16.)  She prescribed Cortisporin drops to be used four times a day for one week and Motrin for thirty days.  (*Id*.)  Cortisporin ear drops contain both antibacterial and anti-inflammatory ingredients.  (*Id*.; Pl.'s Stmt. Facts ¶ 16.)  On September 20, 2013, a nurse saw Plaintiff pursuant to the earache and ear wax protocol sheet and recommended an ear flush.  (Defs.' Stmt. Fact ¶ 17.)  Plaintiff believes that the nurse mis-diagnosed his earache because "you do not flush [an] infection."  (Pl.'s Stmt. Facts ¶ 18.)  On September 25, 2013, Stateville was on lockdown again, therefore, staff had to reschedule Plaintiff's next medical appointment.  (Def.'s Stmt. Facts ¶ 18.)  Meanwhile, Plaintiff did not show up for his ear flush on September 28, 2013.  (*Id*.)

On October 22, 2013, Dr. Obaisi saw Plaintiff for left foot complaints.  (*Id.* ¶ 19.)  Dr. Obaisi also did a physical examination of Plaintiff's ears and found them to be within normal limits, although Plaintiff reported having hearing difficulties.  (*Id*.)  Dr. Obaisi prescribed Bacterium, an antibiotic, and Prednisone, an anti-inflammatory medication.  (*Id*.)  On November 1, 2013, Plaintiff reported to a physician's assistant that he had pain in his right ear and the physician's assistant ordered x-rays.  (*Id.* ¶ 20.)  The x-rays revealed that there was right mastoid haziness of the air cells, which possibly reflected chronic mastoiditis, a bacterial infection of the bone behind the ear.  (*Id*.)  The x-ray report further noted that Plaintiff needed a CT scan to confirm or rule out mastoiditis.  (*Id*.)  On November 6, 2013, IDOC transferred Plaintiff to the Lawrence Correctional Center ("Lawrence").  (*Id.* ¶ 21.)

III.    **Medical Treatment at Lawrence**

4

At Lawrence, staff ordered a CT scan in December 2013, and in January 2014, Lawrence medical staff administered a CT scan of Plaintiff's right ear. (*Id.* ¶ 23.) The CT scan was negative for any abnormalities or infection. (*Id.*) Also, while at Lawrence, a doctor prescribed Plaintiff antibiotic ear drops like Dr. Davis had prescribed while Plaintiff was at Stateville. (Pl.'s Stmt. Facts ¶ 23.) Lawrence staff then sent Plaintiff to an Ear, Nose, and Throat Specialist, who determined that no intervention was necessary for Plaintiff's right ear. (Defs.' Stmt. Facts ¶ 24.)

**SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson,* 477 U.S. at 255 (quotation omitted). A court's "job when assessing a summary judgment motion is not to weigh evidence, make credibility determinations, resolve factual disputes and swearing contests, or decide which inferences to draw from the facts." *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).

ANALYSIS

**I.      Exhaustion**

Defendants maintain that Plaintiff has failed to exhaust his Eighth Amendment deliberate indifference claim as required by the Prison Litigation Reform Act of 1995 ("PLRA"). *See* 42 U.S.C. § 1997e(a). Failure to exhaust administrative remedies is an affirmative defense that Defendants must establish. *See King v. McCarthy,* 781 F.3d 889, 893 (7th Cir. 2015); *Turley v. Rednour,* 729 F.3d 645, 650 (7th Cir. 2013). To exhaust administrative remedies, a "prisoner must comply with the specific procedures and deadlines established by the prison's policy." *King,* 781 F.3d at 893. An Illinois inmate begins the exhaustion process by speaking with a counselor. *See* 20 Ill. Admin. Code § 504.810(a); *Roberts v. Neal*, 745 F.3d 232, 235 (7th Cir. 2014). "When an informal resolution is not achieved by talking to a counselor, an inmate in Illinois has 60 days from the date of the underlying incident to submit a written grievance to the facility's designated grievance officer." *Owens v. Hinsley,* 635 F.3d 950, 955 (7th Cir. 2011); *see also* 20 Ill. Admin. Code § 504.810(a). The grievance officer then submits a recommendation to the warden – the facility's chief administrative officer ("CAO"). *See Roberts,* 745 F.3d at 235. If the inmate is dissatisfied with the response from the CAO, he must then appeal to the Administrative Review Board ("ARB"). *See* 20 Ill. Admin. Code § 504.850(a); *Roberts,* 745 F.3d at 235.

It is undisputed that Plaintiff filed one grievance regarding his right ear condition on August 15, 2013. (Defs.' Stmt. Facts ¶ 6; Pl.'s Stmt. Facts ¶ 8.) Further, it is undisputed that according to the records obtained from the State of Illinois Administrative Review Board, Plaintiff did not appeal any grievance relevant to his medical conditions during the ten-month period at issue in this lawsuit. (Defs.' Stmt. Facts ¶ 6.) Plaintiff, however, has set forth un-

rebutted evidence that a counselor received his medical grievance on August 22, 2013 and that the counselor indicated that the grievance was being sent to the grievance officer and medical care unit for a response. (Pl.'s Stmt. Facts ¶ 8.) Further, there is no indication in the State of Illinois Administrative Review Board Records that Stateville staff responded to Plaintiff's August 15, 2013 grievance. (*Id*. ¶ 9.)

Accordingly, Plaintiff has presented sufficient evidence for trial that prison officials failed to respond to his grievance, and, the Seventh Circuit has held that any such failure can render administrative remedies unavailable. *See Brengettcy v. Horton*, 423 F.3d 674, 682 (7th Cir. 2005); *Lewis v. Washington,* 300 F.3d 829, 835 (7th Cir. 2002). This is relevant because the PLRA "requires exhaustion only of remedies that are available." *King,* 781 F.3d at 893; *see also Thomas v. Reese*, 787 F.3d 845, 847 (7th Cir. 2015). Therefore, considering the facts and all reasonable inferences in Plaintiff's favor, he has presented evidence creating a material dispute for trial that he need not exhaust his administrative remedies under the circumstances. The Court therefore turns to the merits of Plaintiff's deliberate indifference claim.

## II. Deliberate Indifference Claim

In his First Amended Complaint, Plaintiff alleges that Defendants violated his Eighth Amendment rights because they were deliberately indifferent to his serious medical condition. "A prison official may be found in violation of an inmate's Eighth Amendment right to be free from cruel and unusual punishment if she acts (or fails to act) with 'deliberate indifference to [his] serious medical needs.'" *Conley v. Birch,* 796 F.3d 742, 746 (7th Cir. 2015) (quoting *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). Deliberate indifference claims contain both an objective and a subjective component, namely, the inmate must have an objectively serious medical condition and the defendant must be subjectively

aware of and consciously disregard the inmate's serious medical need. *See Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Townsend v. Cooper,* 759 F.3d 678, 689 (7th Cir. 2014). "A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Pyles v. Fahim,* 771 F.3d 403, 409 (7th Cir. 2014).

With respect to the subjective component of the deliberate indifference test, a plaintiff must show that the defendant was aware of and consciously disregarded his medical need. *See Farmer*, 511 U.S. at 837; *Rowe v. Gibson*, 798 F.3d 622, 627 (7th Cir. 2015). "Deliberate indifference may occur where a prison official, having knowledge of a significant risk to inmate health or safety, administers 'blatantly inappropriate' medical treatment, acts in a manner contrary to the recommendation of specialists, or delays a prisoner's treatment for non-medical reasons, thereby exacerbating his pain and suffering." *Perez v. Fenoglio,* 792 F.3d 768, 777 (7th Cir. 2015) (internal citations omitted). It is well-established that "[t]here is not one 'proper' way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). In addition, a "disagreement with a doctor's medical judgment is not enough to prove deliberate indifference" and "medical malpractice is not sufficient to show that doctor acted with deliberate indifference." *Petties v. Carter,* 795 F.3d 688, 691-92 (7th Cir. 2015) (per curiam). In determining deliberate indifference claims, courts examine the totality of the inmate's medical care. *See id.* at 692.

Defendants do not dispute that the medical conditions associated with Plaintiff's right ear are objectively serious for the purposes of the Court's deliberate indifference analysis. Thus, the Court turns to the subjective component of the deliberate indifference test, namely, whether

Defendants were aware of and consciously disregarded Plaintiff's serious medical needs. In response to Defendants' summary judgment motion, Plaintiff argues that he has presented sufficient evidence raising a material dispute for trial that Dr. Obaisi's failure to provide effective treatment for his right ear condition unnecessarily prolonged his pain and that the delay in effective treatment amounted to deliberate indifference. *See Petties*, 795 F.3d at 691 ("Prolonged and unnecessary pain resulting from a significant delay in effective medical treatment may support a claim of deliberate indifference."). Specifically, Plaintiff asserts that following his initial January 2013 ear flush that revealed cockroach parts were lodge in his ear, Dr. Obaisi did not prescribe antibiotic eardrops. Further, Plaintiff argues that Dr. Obaisi continued to prescribe this ineffective treatment, namely, prescribing eardrops without antibiotic ingredients, despite his repeated requests for a different treatment. Plaintiff also maintains that he did not receive antibiotic treatment for his ear until he was transferred to Lawrence in November 2013.[2] As such, Plaintiff argues that he has established that Dr. Obaisi's persistent course of ineffective treatment amounted to Dr. Obaisi's deliberate indifference to his serious medical condition.

It is well-established that a plaintiff's disagreement with a doctor's medical judgment about the proper choice of treatment – or even a disagreement between two medical professionals – is not enough to establish deliberate indifference. *See Pyles,* 771 F.3d at 409.

---

[2] The factual premise for Plaintiff's argument that he did not receive antibiotic treatment for his ear condition until IDOC transferred him to Lawrence in November 2013 is belied by the undisputed facts in the record that Dr. Davis prescribed him Cortisporin ear drops that contained antibacterial and anti-inflammatory ingredients on September 19, 2013. (Defs.' Stmt. Facts ¶ 16; Pl.'s Stmt. Facts ¶ 23.) Further, in October 2013, Dr. Obaisi prescribed Bacterium, an antibiotic, and Prednisone, an anti-inflammatory medication, for Plaintiff's ear condition. (Defs.' Stmt. Facts ¶ 19.)

9

Instead, Plaintiff must set forth evidence that Dr. Obaisi's "treatment strayed so far from accepted professional standards that a jury could infer the doctor acted with deliberate indifference." *Petties,* 795 F.3d at 692. In other words, a "medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" *Pyles,* 771 F.3d at 409 (citations and quotation marks omitted).

Viewing the evidence and all reasonable inferences in Plaintiff's favor, after examining the totality of Plaintiff's medical treatment, the record shows that Stateville health care staff, including Dr. Obaisi, actively provided Plaintiff meaningful and ongoing treatment for his right ear condition from early January 2013 until IDOC transferred Plaintiff to Lawrence in early November 2013, especially in light of undisputed evidence that Dr. Obaisi documented several occasions during this time period where Plaintiff's right ear condition was within normal limits. Specifically, on January 8, 2013, a prison nurse treated Plaintiff's ear condition by providing medication for his ear pain and scheduling an appointment with a doctor for the next day. On January 9, 2013, Dr. Obaisi diagnosed Plaintiff with ear wax impaction to the right ear, prescribed Debrox ear drops, and directed health unit staff to flush Plaintiff's right ear. On January 19, 2013, Plaintiff went to the health care unit for an ear flush, resulting in earwax and parts of cockroaches flushing out of his ear. Health care staff then prescribed eardrops, although it is disputed whether the eardrops contained antibiotics.

Next, Dr. Obaisi saw Plaintiff on April 16, 2013, and although Plaintiff's appointment was in connection with a hand injury, Dr. Obaisi conducted an examination for a medical history report, including examining Plaintiff's right ear. At that time, Dr. Obaisi noted that Plaintiff's right ear was within normal limits and that Plaintiff had no other problems at the time of the

visit. Plaintiff returned to the health care unit on June 22, 2013 and June 29, 2013, due to the re-injury of his hand. On June 29, 2013, Dr. Davis saw Plaintiff and ordered a full set of labs to monitor his health. On July 23, 2013, a nurse saw Plaintiff for his right ear pain. The nurse administered the protocol for earache/ear wax impaction prescribing Plaintiff Acetaminophen and Debrox ear drops.

Because Stateville was on lockdown on days that Plaintiff had medical appointments at the end of August 2013 and beginning of September 2013, Plaintiff returned to the health care unit on September 19, 2013. Dr. Davis then did a full assessment of his right ear and found that the right ear canal had erythematous or otitis externa, namely, inflammation of the ear canal. Dr. Davis prescribed Cortisporin drops that contained both antibacterial and anti-inflammatory ingredients. On October 22, 2013, Dr. Obaisi saw Plaintiff and did a physical examination of Plaintiff's ears finding them to be within normal limits. Dr. Obaisi nonetheless prescribed Bacterium, an antibiotic, and Prednisone, an anti-inflammatory medication.

On November 1, 2013, Plaintiff reported to a physician's assistant that he had pain in his right ear and the physician's assistant ordered x-rays, which revealed that there was right mastoid haziness of the air cells possibly reflecting chronic mastoiditis, a bacterial infection of the bone behind the ear. The x-ray report noted that Plaintiff needed a CT scan to rule out mastoiditis. After IDOC transferred Plaintiff to Lawrence in early November 2013, health care staff ordered a CT scan in December 2013, and administered the CT scan of Plaintiff's right ear in January 2014. The CT scan was negative for any abnormalities or infection.

Despite this ongoing, meaningful care of his right ear condition, Plaintiff takes issue with several incidents. In particular, Plaintiff argues that Dr. Davis "called into question" Dr. Obaisi's prescribed course of treatment. The evidence he points to in support of this statement is

Dr. Davis' September 19, 2013, treatment notes in which she makes no such notation about Plaintiff's earlier course of treatment. (R. 58-7, Defs.' Ex. G, at 26.) Plaintiff further contends that instead of adhering to Dr. Davis' prescribed antibiotic course of treatment, on September 20, 2013, a nurse saw him pursuant to the earache and ear wax protocol sheet and recommended an ear flush. Plaintiff believes that the nurse mis-diagnosed his earache because "you do not flush [an] infection." Considering the facts in Plaintiff's favor, whether the nurse mis-diagnosed Plaintiff's ear problem by recommending an ear flush does not establish that staff did not adhere to Dr. Davis' antibiotic course of treatment. At best, it establishes that the nurse made a mistake, which was harmless because Plaintiff did not show up for his ear flush appointment as scheduled. Moreover, there is no evidence in the record that Stateville staff took Plaintiff off of Dr. Davis' prescribed antibiotic course of treatment.

Furthermore, Plaintiff argues that Dr. Obaisi's course of treatment was contrary to Wexford's Otolaryngolgy Medical Policies and Procedures because he did not prescribe an antibiotic treatment. In particular, the policy as to "ear pain" states "if external otitis ... consider antibiotic ear drops." (R. 69-4, Pl.'s Ex. 5, R. 70-1, Defs.' Ex. L, Otolaryngology Policies & Procedures.) There is nothing in the record that Dr. Obaisi diagnosed Plaintiff with "external otitis," and even if he had, Dr. Obaisi was not required to give antibiotic ear drops pursuant to the Wexford policy because it instructs that the heath care provider "consider antibiotic ear drops." Also, the policy indicates that for a "foreign body in the ear" and "impacted cerumen" treatment should include irrigation until the foreign body/wax emerges – a treatment that Dr. Obaisi and Stateville staff prescribed throughout the relevant ten-month period. (Defs.' Ex. L, Otolaryngology Policies & Procedures.)

Plaintiff's main focus regarding his health care at Stateville is that he did not receive antibiotic treatments throughout the relevant ten-month period, although during that time period, Dr. Obaisi noted twice – on April 16, 2013 and October 22, 2013 – that Plaintiff's right ear was within normal limits. Dr. Obaisi's failure to prescribed antibiotic eardrops or oral antibiotics for Plaintiff's intermittent ear condition is not medical treatment that strays from the accepted professional standard because Plaintiff's health records show that he did not have an ear infection the entire ten-month period. The fact that Plaintiff's right ear was within normal limits on two separate occasions also underscores the fact that the treatment provided at Stateville was successful. As such, Plaintiff's argument that he should have received antibiotics earlier in his treatment boils down to a disagreement with Dr. Obaisi's medical judgment.

On a final note, despite Plaintiff's argument to the contrary, there was no significant delay in the treatment of his intermittent ear condition because Plaintiff has failed to present evidence that any such delay unnecessarily prolonged his pain. *See Perez*, 792 F.3d at 778 ("Whether the length of delay is tolerable depends upon the seriousness of the condition and the ease of providing treatment."). Instead, the record shows that Stateville health care officials promptly attended to Plaintiff's medical needs by prescribing pain medication, eardrops, ear flushing, and, in September 2013, antibiotic treatments. Furthermore, the health care staff continually followed-up with the treatment of Plaintiff's ear condition throughout the ten-month period.

Construing the evidence and all reasonable inferences in Plaintiff's favor, he has failed to present any evidence raising a genuine dispute for trial that Dr. Obaisi was deliberately indifferent to his right ear condition. The Court therefore grants Defendants' motion for summary judgment in its entirety.

## CONCLUSION

For these reasons, the Court grants Defendants' motion for summary judgment in its entirety [57]. Civil case terminated.

**Dated:** October 13, 2015

**ENTERED**

_____
**AMY J. ST. EVE**
**United States District Court Judge**